# OCTOBER TERM, 1972

## PEOPLE v BLOSS

### OPINION OF THE COURT

1. CRIMINAL LAW—OBSCENITY—CONSTITUTIONAL LAW—PRURIENT IN-
TEREST—JUVENILES—PANDERING.

> According to *Redrup v New York*, 386 US 767; 87 S Ct 1414; 18 L
> Ed 2d 515 (1967), before one decides whether material is or is
> not obscene under the interpretations of the *Roth* test *(Roth v
> United States*, 354 US 476; 77 S Ct 1304; 1 L Ed 2d 1498
> [1957]), one must look to the following three tests: (a) the
> involvement of juveniles test; (b) the thrusting-off test; (c) the
> pandering test; unless one of those tests is met, the material,
> however coarse or vulgar it may be, is protected by the First
> and Fourteenth Amendments from governmental suppression,
> whether criminal or civil, in personam or in rem (US Const,
> Ams I, XIV).

2. CRIMINAL LAW—OBSCENITY—CONSTITUTIONAL LAW—JUVENILES—
PUBLICATION.

> United States Supreme Court test for obscenity that is outside
> the protection of the First Amendment has not been met where
> (a) no juveniles were involved, (b) there was no obtrusive
> publication to an unwilling individual, (c) and there were no
> circumstances of production, sale, and publicity, of presentation
> and dissemination, or of open advertising as occurred in *Ginz-
> burg v United States*, 383 US 463; 86 S Ct 942; 16 L Ed 2d 31
> (1966) (US Const, Am I).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–9] 50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 3–11.
  Modern concept of obscenity, 5 ALR3d 1158.
  Constitutionality of federal and state regulation of obscene litera-
    ture—federal cases, 1 L Ed 2d 2211, s. 4 L Ed 2d 1821.
[3, 4] Comment.—Validity of procedures designed to protect the public
  against obscenity, 5 ALR3d 1214.

DISSENTING OPINION

T. M. KAVANAGH, C. J., AND T. E. BRENNAN, J.

3. CONSTITUTIONAL LAW—STATUTES—OBSCENITY—PRURIENT INTEREST.

Embodiment in state obscenity statutes of all Federal explanatory rationales justifying the suppression of obscene publications such as a test referring to prurient interest specifically has not been required by the United States Supreme Court as a matter of constitutional law.

4. CRIMINAL LAW—OBSCENITY—STATUTES.

Michigan statutory test of obscenity is in precisely the language of a United States Supreme Court decision.

5. CRIMINAL LAW—OBSCENITY—CONSTITUTIONAL LAW.

The test that material be utterly without redeeming social value is implicit in any proscription of obscenity, for it is the character of being utterly without redeeming social value which places obscenity outside the protections of the First Amendment (US Const, Am I).

6. CRIMINAL LAW—OBSCENITY—EVIDENCE.

Convictions of defendants in three cases for trafficking in obscene material were warranted where there was a clear evidentiary basis for finding by the trial courts, sitting as the triers of fact, which made unassailable findings, fully supported by the record, that beyond a reasonable doubt: (1) the dominant theme of the material taken as a whole appealed to the prurient interest in sex; (2) the material was patently offensive because it affronted contemporary community standards relating to the description or representation of sexual matters; and (3) the material was utterly without redeeming social value.

7. CRIMINAL LAW—OBSCENITY—PUBLICATIONS.

Obscenity convictions should have been affirmed on the basis of a United States Supreme Court decision which indicated that where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity.

8. CRIMINAL LAW—OBSCENITY—PANDERING—PORNOGRAPHY.

A finding of pandering supports a determination that material is obscene; where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters, such evidence may support the determination

*that the material is obscene even though in other contexts the
material would escape such condemnation.*

9. CRIMINAL LAW—OBSCENITY—PUBLICATIONS.
   *Circumstances under which defendants commercially offered pub-
   lications rendered conclusive the determination that such pub-
   lications are obscene.*

Appeal from Court of Appeals, J. H. Gillis, P. J.,
and McGregor and Quinn, JJ., affirming Kent,
John T. Letts and Roman Snow, JJ. Submitted
November 3, 1971. (No. 22 October Term 1971,
Docket Nos. 53,135–53,137.) Decided October 31,
1972.

27 Mich App 687 reversed.

Floyd Bloss and Clifford Hughes were convicted
of selling obscene literature. Defendants appealed
to the Court of Appeals. Affirmed. Defendant Bloss
appeals. Reversed and defendant discharged.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *James K. Miller,*
Prosecuting Attorney, and *S. J. Venema,* Special
Assistant Prosecuting Attorney, for the people.

*John W. Piggott, P. C.,* for defendant Bloss.

ADAMS, J. The United States Supreme Court has
declared obscenity to be outside the First Amend-
ment guarantee of free speech *(Roth v United
States,* 354 US 476; 77 S Ct 1304; 1 L Ed 2d 1498
[1957]). It has attempted to define what constitutes
obscenity. In *Memoirs v Massachusetts,* 383 US
413, 418; 86 S Ct 975; 16 L Ed 2d 1 (1966), Justice
Brennan wrote:

"We defined obscenity in *Roth* in the following terms:
'[W]hether to the average person, applying contempo-

rary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

In *Jacobellis v Ohio,* 378 US 184, 195; 84 S Ct 1676; 12 L Ed 2d 793 (1964), Justice Brennan asserted that the "community standards" test "must be determined on the basis of a national standard."[1] In *Ginzburg v United States,* 383 US

---

[1] In *People v Bloss,* Kent County Circuit Court File No 11855, Judge Letts had this to say about contemporary community standards:

"If we go to the second one, talking about contemporary community standards, how can we determine what contemporary community standards are by driving from here to New York and forgetting about the Central part of America, or the United States, and the Western part, or driving in the other direction, driving South? The question is, are the standards in New York the same as they are in Tuscaloosa, Alabama? Are the same standards, let's say in Hell, Michigan, the same as they are in Tupelo, Mississippi, or Reno, Nevada, or Los Angeles? Who is an authority on that sort of thing? Is the Supreme Court an authority? Where do they come from? What is the genus of their existence? Where do they live? What part? Did they live all over the United States? Are they able to say that contemporary community standards are the same all over the United States? I think not, no more than I am able to do so. You drive into San Francisco and look in the window, you might see a magazine like this. You drive into New York, you might see one. You go to Hell, Michigan, and I doubt very seriously that you would see one. You go to Tuscaloosa, Alabama, and I know you won't see one, nor in many of the states of the South, their opinion of womanhood and manhood being somewhat different, sectionally speaking. So what do they mean when they say: 'contemporary standards'? We interpret it as meaning national standards. Well, what are national standards? I don't believe there are any, at least as it reflects here, or maybe reflected here in the magazines. Maybe someday we will have a national standard on everything, and when we do I suppose we will become so much alike there will be no need for us to change our abode, or change our way of living when we move into neighborhoods and other areas. Even within the city itself, the contemporary community standards if

463; 86 S Ct 942; 16 L Ed 2d 31 (1966), it was determined that if one "pandered" the material to exploit its sexual content, the material could be deemed obscene regardless of whether it had failed the "utterly without redeeming social value" test mentioned in *Memoirs, supra.* Justice Brennan described "pandering" as follows (pp 465–466, 467–471):

"In the cases in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question. In the present case, however, the prosecution charged the offense in the context of the circumstances of production, sale, and publicity and assumed that, standing alone, the publications themselves might not be obscene. We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity, and assume without deciding that the prosecution could not have succeeded otherwise. As in *Mishkin v New York, post* [383 US 502; 86 S Ct 958; 16 L Ed 2d 56 (1966)], p. 502, and as did the courts below, 224 F. Supp., at 134, 338 F. 2d, at 14–15, we view the publications against a background of commercial exploitation of erotica solely for the sake of their prurient appeal. The record in that regard amply supports the decision of the trial judge that the mailing of all three publications offended the statute.

\* \* \*

relegated to a certain place like Kentwood, Plainfield Township, or Bay City, Michigan, all of the standards are different. The court's standards are different all over the United States. Hardly do you find any two alike. Some have a master calendar, some have a general assignment. Some don't even have jury trials for civil cases, as in Louisiana. So what are the contemporary community standards? Does Louisiana have to conform to Michigan? Does Michigan have to conform to California? I think not. Certainly contemporary community standards are not the same in Grand Rapids as they are in Amity, Indiana, the home of the Amish."

In *People v Bloss,* Kent County Circuit Court Case No 11929, Judge Letts stated: "I do not agree that we apply national standards \* \* \* ."

"[T]here was abundant evidence to show that each of the accused publications was originated or sold as stock in trade of the sordid business of pandering—'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers.' EROS early sought mailing privileges from the postmasters of Intercourse and Blue Ball, Pennsylvania. The trial court found the obvious, that these hamlets were chosen only for the value their names would have in furthering petitioners' efforts to sell their publications on the basis of salacious appeal; the facilities of the post offices were inadequate to handle the anticipated volume of mail, and the privileges were denied. Mailing privileges were then obtained from the postmaster of Middlesex, New Jersey. EROS and Liaison thereafter mailed several million circulars soliciting subscriptions from that post office; over 5,500 copies of the *Handbook* were mailed.

"The 'leer of the sensualist' also permeates the advertising for the three publications. The circulars sent for EROS and Liaison stressed the sexual candor of the respective publications, and openly boasted that the publishers would take full advantage of what they regarded as an unrestricted license allowed by law in the expression of sex and sexual matters. The advertising for the *Handbook,* apparently mailed from New York, consisted almost entirely of a reproduction of the introduction of the book, written by one Dr. Albert Ellis. Although he alludes to the book's informational value and its putative therapeutic usefulness, his remarks are preoccupied with the book's sexual imagery. The solicitation was indiscriminate, not limited to those, such as physicians or psychiatrists, who might independently discern the book's therapeutic worth. Inserted in each advertisement was a slip labeled 'GUARANTEE' and reading, 'Documentary Books, Inc. unconditionally guarantees full refund of the price of THE HOUSEWIFE'S HANDBOOK ON SELECTIVE PROMISCUITY if the book fails to reach you because of U.S. Post Office censorship interference.' Similar slips appeared in the advertising for EROS and Liaison; they highlighted the gloss petitioners put on the publica-

tions, eliminating any doubt what the purchaser was being asked to buy.

"This evidence, in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality—whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly in a prosecution which, as here, does not necessarily imply suppression of the materials involved, the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test."

None of the Supreme Court decisions were signed by a majority of the Justices until *Redrup v New York,* 386 US 767; 87 S Ct 1414; 18 L Ed 2d 515 (1967). As noted by Justice Harlan in his concurring and dissenting opinion in *Ginsberg v New York,* 390 US 629, 676, 704–705, 707; 88 S Ct 1274; 20 L Ed 2d 195 (1968):

"The subject of obscenity has produced a variety of views among the members of the Court unmatched in any other course of constitutional adjudication. * * * .

"The upshot of all this divergence in viewpoint is that anyone who undertakes to examine the Court's decisions since *Roth* which have held particular material

obscene or not obscene would find himself in utter
bewilderment."[2]

In *Redrup, supra,* obscenity statutes of three
different states were involved. In each case the
Supreme Court, in a per curiam decision signed by
seven of the nine Justices, concluded that the
distribution of the material therein involved was
"protected by the First and Fourteenth Amend-
ments from governmental suppression, whether
criminal or civil, *in personam* or *in rem.*" The
following statement appears in the per curiam
opinion (p 769):

"In none of the cases was there a claim that the
statute in question reflected a specific and limited state
concern for juveniles. See *Prince v Massachusetts,* 321
U.S. 158 [64 S Ct 438; 88 L Ed 645 (1944)]; cf. *Butler v
Michigan,* 352 U.S. 380 [77 S Ct 524; 1 L Ed 2d 412
(1957)]. In none was there any suggestion of an assault
upon individual privacy by publication in a manner so
obtrusive as to make it impossible for an unwilling
individual to avoid exposure to it. Cf. *Breard v Alexan-
dria,* 341 U.S. 622 [71 S Ct 920; 95 L Ed 1233 (1951)];
*Public Utilities Comm'n v Pollak,* 343 U.S. 451 [72 S Ct
813; 96 L Ed 1068 (1952)]. And in none was there
evidence of the sort of 'pandering' which the Court
found significant in *Ginzburg v United States,* 383 U.S.
463."

Although recognizing that the Court had differ-

---

[2] In his opinion in *People v Bloss,* Kent County Circuit Court File
No 11855, Judge Letts observed:

"So, therefore, it would seem that Roth v United States probably is,
or may or may not still be the standard; and Redrup still may or may
not be the law, because the Supreme Court has indicated that each
individual case will stand or fall upon the facts as they are presented.
And whether the law as it has been presented, as it has been
compounded or propounded is applicable. In other words, *the entire
field of obscenity is in a morass,* and it is my opinion that each case
must be decided upon its own, according to its own values as pre-
sented in Court." (Emphasis added.)

ing views on the tests to determine obscenity, the Court concluded that whatever view was used, the judgments holding the materials to be obscene could not stand. This opinion was signed by Justices Douglas and Black who believed that obscenity was protected by the Constitution (see *Roth, supra)*, Justice Warren who believed "community standards" meant local standards (see *Jacobellis, supra)*, Justice Stewart who believed only "hardcore" pornography was proscribed (see *Jacobellis, supra)*, and Justice White who believed that the "social importance test" was not an independent criteria to determine obscenity (see *Memoirs, supra).*[3]

Therefore, according to *Redrup,* before one decides whether material is or is not obscene under the *Roth* test, one must look to the three tests in *Redrup.* Unless one of those tests is met, the material, however coarse or vulgar it may be, is "protected by the First and Fourteenth Amendments from governmental suppression, whether criminal or civil, *in personam* or *in rem.*"

Since *Redrup,* the United States Supreme Court has reversed some 28 cases on the basis of

[3] In 1971, with 2 new Justices on the Bench, the Supreme Court issued a majority opinion signed by 6 of the Justices in *United States v Reidel,* 402 US 351; 91 S Ct 1410; 28 L Ed 2d 813 (1971). Justice White, writing for the Court, stated (p 357):

"It is urged that there is developing sentiment that adults should have complete freedom to produce, deal in, possess, and consume whatever communicative materials may appeal to them and that the law's involvement with obscenity should be limited to those situations where children are involved or where it is necessary to prevent imposition on unwilling recipients of whatever age. The concepts involved are said to be so elusive and the laws so inherently unenforceable without extravagant expenditures of time and effort by enforcement officers and the courts that basic reassessment is not only wise but essential. This may prove to be the desirable and eventual legislative course. But if it is, the task of restructuring the obscenity laws lies with those who pass, repeal, and amend statutes and ordinances. *Roth* and like cases pose no obstacle to such developments."

*Redrup.*[4] The most significant one in connection with the present cases is *Grand Rapids City Attorney v Bloss,* 17 Mich App 318 (1969); leave to appeal denied, 383 Mich 754; *rev'd sub nom Bloss v Dykema,* 398 US 278; 90 S Ct 1727; 26 L Ed 2d 230 (1970). In that case, Judge CHARLES L. LEVIN, dissenting in the Court of Appeals, wrote (pp 340, 343–344):

"I am in entire agreement with my colleagues that the seized magazines are vulgar, tawdry and unpleasant. The question before us, however, is not whether these odious magazines are obscene in the ordinary sense of the word—they clearly are—but whether they are obscene in the constitutional sense. The phrase 'obscene in the constitutional sense' is a term of art

---

[4] *Keney v New York,* 388 US 440; 87 S Ct 2091; 18 L Ed 2d 1302 (1967); *Friedman v New York,* 388 US 441; 87 S Ct 2091; 18 L Ed 2d 1303 (1967); *Ratner v California,* 388 US 442; 87 S Ct 2092; 18 L Ed 2d 1304 (1967); *Cobert v New York,* 388 US 443; 87 S Ct 2092; 18 L Ed 2d 1305 (1967); *Sheperd v New York,* 388 US 444; 87 S Ct 2093; 18 L Ed 2d 1306 (1967); *Avansino v New York,* 388 US 446; 87 S Ct 2093; 18 L Ed 2d 1308 (1967); *Aday v United States,* 388 US 447; 87 S Ct 2095; 18 L Ed 2d 1309 (1967); *Books, Inc v United States,* 388 US 449; 87 S Ct 2098; 18 L Ed 2d 1311 (1967); *A Quantity of Copies of Books v Kansas,* 388 US 452; 87 S Ct 2104; 18 L Ed 2d 1314 (1967); *Mazes v Ohio,* 388 US 453; 87 S Ct 2105; 18 L Ed 2d 1315 (1967); *Schackman v California,* 388 US 454; 87 S Ct 2107; 18 L Ed 2d 1316 (1967); *Potomac News Co v United States,* 389 US 47; 88 S Ct 233; 19 L Ed 2d 46 (1967); *Conner v City of Hammond,* 389 US 48; 88 S Ct 234; 19 L Ed 2d 47 (1967); *Central Magazine Sales, Ltd v United States,* 389 US 50; 88 S Ct 235; 19 L Ed 2d 49 (1967); *Chance v California,* 389 US 89; 88 S Ct 253; 19 L Ed 2d 256 (1967); *I. M. Amusement Corp v Ohio,* 389 US 573; 88 S Ct 690; 19 L Ed 2d 776 (1968); *Robert-Arthur Management Corp v Tennessee,* 389 US 578; 88 S Ct 691; 19 L Ed 2d 777 (1968); *Childs v Oregon,* 401 US 1006; 91 S Ct 1248; 28 L Ed 2d 542 (1971); *Felton v Pensacola,* 390 US 340; 88 S Ct 1098; 19 L Ed 2d 1220 (1968); *Henry v Louisiana,* 392 US 655; 88 S Ct 2274; 20 L Ed 2d 1343 (1968); *Carlos v New York,* 396 US 119; 90 S Ct 395; 24 L Ed 2d 303 (1969); *Cain v Kentucky,* 397 US 319; 90 S Ct 1110; 25 L Ed 2d 334 (1970); *Bloss v Dykema,* 398 US 278; 90 S Ct 1727; 26 L Ed 2d 230 (1970); *Walker v Ohio,* 398 US 434; 90 S Ct 1884; 26 L Ed 2d 385 (1970); *Hoyt v Minnesota,* 399 US 524; 90 S Ct 2241; 26 L Ed 2d 782 (1970); *Bloss v Michigan,* 402 US 938; 91 S Ct 1615; 29 L Ed 2d 106 (1971); *Burgin v South Carolina,* 404 US 806; 92 S Ct 46; 30 L Ed 2d 39 (1971); *Hartstein v Missouri,* 404 US 988; 92 S Ct 531; 30 L Ed 2d 539 (1971).

coined by the United States Supreme Court and, to the extent it has defined that term, its definition is controlling upon us. Neither my personal opinion nor, I respectfully add, the opinions of my colleagues is relevant where there is a controlling opinion from the United States Supreme Court.

"The United States Supreme Court has undertaken the exposition and control of the development of this area of the law. It has made it very clear that only in extraordinary cases will publications be deemed obscene in the constitutional sense.

* * *

"I agree with Judge DANHOF that the trial judge clearly erred when he found that there was pandering in this case. The defendant sold these magazines in a bookstore to which no one under the age of 18 is admitted. There is a $1 admission charge, 50¢ of which is credited against any purchase. The defendant also operates an art, adult-only movie theatre. He advertises, on the screen and by displaying the magazines in the theatre lobby, the fact that such publications can be purchased at the bookstore.

"By displaying the magazines themselves without any description of their contents the defendant avoided any characterization, suggestive or otherwise, concerning the nature of the magazines on display. By displaying the magazines in an 'adult-only' movie theatre the defendant avoided any communication with persons who might regard the sight of such a magazine as an objectionable intrusion. The on-screen advertising of the availability of these magazines and their display in the lobby of such a movie theatre is neither 'pandering' nor 'obtrusive' in the sense in which those terms were used in *Redrup* and *Ginzburg v United States* (1966), 383 US 463 (86 S Ct 942, 16 L Ed 2d 31)."

The facts in *Grand Rapids City Attorney, supra,* are the same or similar to those in these cases. In *People v Bloss,* Kent County Circuit Court File No 11855, an information was filed April 18, 1968, alleging violation of MCLA 750.343a; MSA

28.575(1), by the sale of two allegedly obscene magazines, *The Male Swinger* and *New Horizons.* Bloss was the owner of an adult bookstore, the Capri Bookstore and Library, where these two magazines were purchased.

Evidence at a nonjury trial before Judge John T. Letts showed that the Capri Theater, also owned by Bloss, had a display rack of magazines similar to or the same as the publications in question. The sign above this rack stated: "This product is available at the Capri Bookstore and Library at 303 South Division." An ad shown during the movies also gave this information and a Grand Rapids Press want ad asked for a censor for the bookstore. It was not shown that the want ad gave any description of the material to be inspected.

The trial testimony also showed that the theater lobby, in which these magazines were advertised, was enclosed and not observable to the public from the street. The theater was an adult movie house showing the same type of material as found in the bookstore. Marquee advertisements only gave the names of the current films, as did the movie theater ads in the Grand Rapids Press. No indication was given that magazines would be displayed within the lobby.

The Capri Bookstore and Library was closed to public view by the means of shades. There were no displays in either the windows or the doorway. To enter, one had to be at least 18 years of age and pay an admittance fee of $1. The business name was the only sign outside the store. A policeman bought the two magazines in question. He testified: "My instructions were to go to the store, examine the books and to purchase any that I felt were obscene."

Judge Letts applied the *Roth* tests and concluded the material was obscene.

In *People v Bloss,* Kent County Circuit Court File No 11929, an information was filed May 23, 1968, alleging violation of MCLA 750.343a; MSA 28.575(1), by the sale of 10 books and magazines other than the 2 mentioned in the previous complaint. In a nonjury trial before Judge Letts, it was shown that these books and magazines were purchased in the same manner as in the previous case. The same evidence as to the movie theater and bookstore was introduced.

In this case, the advertising in the theater was held to constitute pandering and the materials in question were determined to be obscene.

In *People v Bloss,* Kent County Circuit Court File No 11854, an information was also filed April 18, 1968, alleging violation of MCLA 750.343a; MSA 28.575(1), by the sale of two magazines, *Galarie 4 DSI* and *Cover Girl, International Art Magazine, Scandinavia Edition.*

The circumstances of sale and the evidence with regard to the theater and bookstore were the same as in the previous two cases. Testimony also showed that Bloss was interviewed on television about his movies and books. The movies were also advertised over radio stations.

No evidence was taken as to the actual content of the television interviews or the radio ads. It was not indicated whether the interviews were news items or advertisements.

In the nonjury trial before Judge Roman J. Snow, the court concluded, since anyone could enter the theater lobby and since Bloss stated on television he was selling the type of material in question at his bookstore, there was pandering. Obscenity was found, relying on both the *Roth* and *Redrup* tests.

If we apply the *Redrup* tests to the facts in these

cases, we must conclude, as did Judge LEVIN, that the United States Supreme Court test for obscenity which is outside the protection of the First Amendment has not been met.

(a) *The Involvement of Juveniles Test*

The people concede in their brief that "no juveniles were involved in the cases at bar."

(b) *The Thrusting-Off Test*

(c) *The Pandering Test*

These two tests will be discussed together. It will be recalled that in *Redrup, supra,* 769, the United States Supreme Court said:

"In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it."

The evidence in these cases is clear that the *modus operandi* of defendant, as found by Judge LEVIN in *Grand Rapids City Attorney, supra,* involved no obtrusive publication to an unwilling individual. Since no indication was given that the lobby contained magazines on display, it is hard to imagine who would want to enter an adult movie theater just to view the lobby. Certainly a person who was against the movies being shown would not want to open the door of the theater to view the premises.

There are no circumstances of production, sale, and publicity, of presentation and dissemination, or of open advertising in these cases such as occurred in *Ginzburg, supra.*

In 1644, John Milton, in *Areopagitica,* his famous essay directed against the licensing law then in effect in England, wrote:

"We ourselves esteem not of that obedience, or love, or gift, which is of force: God therefore left him free, set before him a provoking object ever almost in his eyes; herein consisted his merit, herein the right of his reward, the praise of his abstinence. Wherefore did he create passions within us, pleasures round about us, but that these rightly tempered are the very ingredients of virtue? They are not skilful considerers of human things, who imagine to remove sin by removing the matter of sin; for, besides that it is a huge heap increasing under the very act of diminishing, though some part of it may for a time be withdrawn from some persons, it cannot from all, in such a universal thing as books are; and when this is done, yet the sin remains entire. Though ye take from a covetous man all his treasure, he has yet one jewel left: ye cannot bereave him of his covetousness. Banish all objects of lust, shut up all youth into the severest discipline that can be exercised in any hermitage, ye cannot make them chaste that came not thither so: * * * ."[5]

The problems of censorship depicted by the poet Milton over 300 years ago exist today. How else explain the performance of the United States Supreme Court from *Roth* to *Redrup?* In effect, the Court, in attempting to define obscenity, marched up the hill and then marched down again. It may be that the Justices concluded, as did Milton— better the judgment of the ages than the contem-

---

[5] In 1953, President Dwight D. Eisenhower said it this way in his Letter on Intellectual Freedom to the American Library Association meeting in annual convention at Los Angeles:

"But we know that freedom cannot be served by the devices of the tyrant. As it is an ancient truth that freedom cannot be legislated into existence, so it is no less obvious that freedom cannot be censored into existence. And any who act as if freedom's defenses are to be found in suppression and suspicion and fear confess a doctrine that is alien to America."

porary judgment of 20 censors.[6] Or it may be that
the Court has abandoned the "contemporary stan-
dards" test, realizing how ephemeral and fleeting
such a standard must be.[7]

I agree with Chief Justice T. M. Kavanagh that
there was no necessity in the instant cases for the
Court of Appeals "to promulgate a new test, fur-
ther muddying the waters of the flood of obscenity
cases."

There are serious questions in these three cases
as to whether the trial judges did, in fact, apply
the correct United States Supreme Court *Roth*
standards. However, it is unnecessary to decide
such questions since, in my view, under *Redrup,*
the people did not make out a case.

I vote to reverse and vacate the judgments and
to discharge defendant.

---

[6] Professors William B. Lockhart and Robert C. McClure, writing in
38 Minn L Rev 295 (March, 1954), in an article entitled *Literature,
The Law of Obscenity, and the Constitution,* give this picture of
censorship in Detroit in the early 1950's:

"In Detroit, where the police do their own censoring, the censor
bureau's lists show the same obtuseness to literary values. It is quite
apparent that the censor bureau has never accepted the Detroit
public library's offer. to advise it on literary values, for its list of some
150 books declared to be in violation of Michigan law includes such
books as James T. Farrell's *A World I Never Made,* Ernest Heming-
way's *Across the River and Into the Trees,* John O'Hara's *The
Farmers Hotel,* Jan Valtin's *Wintertime,* James Warner Bellah's
*Ward 20,* and Lillian Smith's *Strange Fruit.* And its list of partially
objectionable books includes Sherwood Anderson's *Dark Laughter,*
John Dos Passos' *The Forty-Second Parallel,* James T. Farrell's *No
Star is Lost,* Mackinlay Kantor's *Signal Thirty-Two,* and Ethel Wa-
ters' *His Eye Is on the Sparrow.*"

[7] In *Besig v United States,* 208 F2d 142 (CA 9, 1953), Henry Miller's
*Tropic of Cancer* and *Tropic of Capricorn* were held to be obscene. By
contrast, Professor Frederick V. Bernard, testifying as an expert on
obscenity for the People in Kent County Circuit Court Case No 11929,
stated:

"*A.* In the last year I have re-read 'The Tropic of Cancer,' 'The
Tropic of Capricorn.'

"*Q.* Do you take the position those two books are obscene?

"*A.* I beg pardon?

"*Q.* Do you take the position that those two books are obscene?

"*A.* Absolutely not."

T. G. KAVANAGH, and SWAINSON, and WILLIAMS, JJ., concurred with ADAMS, J.

T. M. KAVANAGH, C. J. *(dissenting).* Defendants, having been charged in three separate actions on single count informations with violation of MCLA 750.343a; MSA 28.575(1), were convicted upon non-jury trials. Each charge included pandering of the allegedly obscene publications.

In a lengthy opinion by Judge J. H. GILLIS, the Court of Appeals affirmed the convictions, promulgating a new obscenity test:

> "Given that the published material is obscene within the meaning of a state statute, not void for vagueness, the publisher of the material loses any claim to protection under the First and Fourteenth Amendments if his primary intent in publishing the material is to appeal to the recipient's prurient interest in sex." 27 Mich App 687, 701 (1970).

We granted leave to appeal. 384 Mich 802. On appeal to this Court, defendants raise the following four issues:

1. Is the Michigan statute MSA 28.575(1), (2), being MCLA 750.343a and b unconstitutional on its face and as applied to defendants?

2. Are the materials involved in the three cases consolidated herein obscene in the constitutional sense as defined by the United States Supreme Court?

3. Does the rule now laid down by the Court of Appeals and applied to the defendants-appellants after trial deny to them due process and equal protection in violation of their constitutional rights?

4. Is there a conflict in the decisions of the

Michigan Court of Appeals which ought to be resolved by this Court?

With respect to the issue of constitutionality, defendants argue that MCLA 750.343b, which comprises the test for determination of violations of MCLA 750.343a, fails to incorporate fully the tests of *Roth v United States,* 354 US 476; 77 S Ct 1304; 1 L Ed 2d 1498 (1957). They point to three alleged deficiencies.

First, they claim the statutory test fails to refer to prurient interest specifically. We know of no instance in which the United States Supreme Court has required as a matter of constitutional law the embodiment in state obscenity statutes of all Federal explanatory rationales justifying the suppression of obscene publications. *Cf. Roth, supra,* 354 US at 491; 77 S Ct at 1312; 1 L Ed 2d at 1510 (1957).

Second, they contend that a *national* community standard is not expressly required by the statute, citing *Jacobellis v Ohio,* 378 US 184; 84 S Ct 1676; 12 L Ed 2d 793 (1964). We can only observe that our statutory test is in precisely the language of *Roth, supra.*

Third, they attack the statute for failing to incorporate the standard in *Roth, supra,* that the material be utterly without redeeming social value. Examination of *Roth,* however, dictates the observation that such test is implicit in any proscription of obscenity, for it is the character of being utterly without redeeming social value which places obscenity outside the protections of the First Amendment.

Defendants' next issue in effect addresses itself to the sufficiency of the evidence. In each instance, however, the trial courts, sitting as the triers of fact, made unassailable findings that beyond a

reasonable doubt: (1) the dominant theme of the material taken as a whole appealed to the prurient interest in sex; (2) the material was patently offensive because it affronted contemporary community standards relating to the description or representation of sexual matters; and (3) the material was utterly without redeeming social value. Those findings of fact are fully supported by the record.

In addition to such clear evidentiary basis for those findings, which, standing alone, would warrant convictions for trafficking in obscene material, there was also sufficient evidence, as found by the trial courts, of pandering of the sort condemned by the United States Supreme Court in *Ginzburg v United States,* 383 US 463; 86 S Ct 942; 16 L Ed 2d 31 (1966). In fact, the Court of Appeals even concluded with this observation:

"The issue of pandering was clearly before the court in each case and both sides introduced evidence on the proposition and it was argued to the court. We could affirm the convictions solely on the basis of *Ginzburg,* as the trial courts indicated that they had done." 27 Mich App 687, 712–713.

We are of the opinion that the Court of Appeals not only *could* have, but *should* have, affirmed on the basis of *Ginzburg,* there being no necessity in the instant cases to promulgate a new test, further muddying the waters of the flood of obscenity cases.

As the United States Supreme Court indicated in *Ginzburg:*

"[T]he circumstances of presentation and dissemination of material are equally relevant to determining [the] social importance claimed for material * * * . Where the purveyor's sole emphasis is on the sexually

provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly * * * the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test." 383 US 463, 470–471; 86 S Ct 942, 947; 16 L Ed 2d 31, 38 (1966).

The caveat expressed by the Court makes clear that a finding of pandering supports the determination that the material is obscene. As they put it:

"It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged. Where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters, such evidence may support the determination that the material is obscene even though in other contexts the material would escape such condemnation." 383 US 463, 475–476; 86 S Ct 942, 950; 16 L Ed 2d 31, 41 (1966).

Notwithstanding the foregoing, defendants would have us rule that the materials involved are not obscene in the constitutional sense. This we cannot do. Guided by the rule in *Ginzburg,* we are compelled to conclude that the circumstances under which defendants commercially offered the instant publications rendered conclusive the determination that such publications are obscene.

The primary thrust of defendants' argument on appeal rests on *Redrup v New York,* 386 US 767; 87 S Ct 1414; 18 L Ed 2d 515 (1967), and cases decided thereunder. Such a misguided approach to this case presents but a partial perspective, for in *Redrup,* the United States Supreme Court held, *inter alia,* that there was "[no] evidence of the sort of 'pandering' which the Court found significant in *Ginzburg v United States,* 383 U.S. 463 [; 86 S Ct

942; 16 L Ed 2d 31 (1966)]." Thus, *Redrup* not being a pandering case, we do not consider it, or its progeny, applicable here.

In view of our disposition of the first two issues, discussion of the last two is unnecessary.

Defendants' convictions are affirmed.

T. E. BRENNAN, J., concurred with T. M. KAVANAGH, C. J.

BLACK, J., concurred in the result.