Edward J. McLaughlin, J.
The matter before the court is a petition brought on behalf of the original respondent, Robert H., by his Law Guardian in the capacity of next friend. The petition prays that this court terminate the placement of the child as a person in need of supervision (PINS) with the Division for Youth at its facility at Tryon School, on the grounds that residents have threatened Robert with physical abuse, and have subjected him to sexual contact. The petitioner requests that the order of placement be vacated and the child released pursuant to section 764 of the Family Court Act.
Further, the petitioner, in the original PINS petition, the father of Robert, has asked that the court grant the Law Guardian’s request to terminate placement, or in the alternative, to dismiss the original petition.
This case raises a continuing problem with regard to the placement of children by the Family Court as persons in need of supervision, pursuant to section 756 of the Family Court Act, where the parent, after successfully petitioning the court to adjudicate their child a person in need of supervision, thereafter, dissatisfied with the disposition ordered by the court, then wish to discontinue the action. Because of the importance of the problem raised and the lack of judicial precedent to guide the court, it is felt that a detailed analysis of this case will be of value.
*28 The respondent, Robert H., is a 16-year-old boy who at age 15 was adjudicated a person in need of supervision. He was petitioned into Family Court by his father for threatening that "there would be bloodshed in the family and it wouldn’t be his”, and also he threatened to set the family home on fire. Robert had been making these threats since his return from a stay at the Crane Hill School of the Marcy Psychiatric Center in June of 1975. From the time of his return home, Robert’s family was living in fear of their safety, since he was not obeying any reasonable commands.
Robert has been having difficulties in his home and in school for many years. According to reports from Crane Hill School, both of Robert’s parents are preoccupied with their own personal problems and are overtly rejective of their son. It is reported that the respondent stuttered until the age of three or four; has had behavioral problems from the age of three, which have continued; and is overly aggressive toward his parents, siblings, peers and teachers.
During the school year 1973-1974, while attending junior high school, Robert caused trouble by striking his teachers and fighting with fellow students. He was described as having mood changes for no apparent reason.
In July of 1974, Robert was referred as an outpatient at Marcy Psychiatric Center by a psychologist of the Oneida County-City School District. An evaluation was conducted by Crane Hill School at Marcy, and recommendations were made for a residential placement. On October 18, 1974, Robert was placed at the House of the Good Shepherd.
The report submitted at the dispositional hearing included the substance of a conversation which the probation officer had with a social worker at the House of the Good Shepherd in regard to Robert’s behavior while under their care. The social worker stated that Robert was referred by the Oneida County Department of Social Services because of his difficulty adjusting in school and his causing trouble in the neighborhood. He was described as needing structure and external control. The social worker further stated that Robert was aggressive, had trouble controlling his impulses, would not accept responsibility for his actions, and would not go along with the group. Robert was described as a nonsocialized child. It was indicated that Robert could benefit from a long-term placement, as he needed a structured living environment that could help him work on his external controls and stop at *29 tempting to manipulate his environment, as well as improving his academic learning skills.
Robert ran away from the House of the Good Shepherd on January 10, 1975. Because his placement was voluntary and his parents did not want him to be returned, the placement was terminated. According to the social worker, the incident that precipitated the youth’s running away occurred when he was misbehaving and was told to go to his room by a female counselor. Robert became upset and after threatening to hit her, was restrained by a male counselor and sent to his room. Later that day, he ran away from the institution. Robert then remained at home until March of 1975.
It was alleged that Robert was involved in two incidents of arson which occurred on March 14, 1975. At the time, Robert admitted to the allegations, although he subsequently retracted his admission. Robert was placed at Marcy on March 15, 1975.
Another social worker at Crane Hill School advised Robert’s probation officer that he was in need of a supervised living situation. The worker stated that Robert is not psychiatrically disturbed, but that he does have behavioral problems. He continued by stating that Crane Hill was not appropriate, but neither was the home environment. In June of 1975, Robert returned home from Crane Hill.
Robert told his probation officer that most of his problems at home are due to his father and the way he is treated, stating that "his father would always find fault with the way he does a chore and his mother would agree with his father”. Robert further stated that, "if he were to earn some money, his father would take it away from him”. Robert added that "his older brother left home a couple of months before, because of his father”. The brother was, at the time of the interview, being detained in the Oneida County Jail awaiting trial on a charge of robbery.
Robert’s mother advised his probation officer that her husband becomes irritable very easily, because of his medical condition. She stated that her husband cannot control the children. The mother then added that she also has medical problems and that she and her husband cannot tolerate the children constantly running away from home. The father told the probation officer that he would try to discipline the boys and tell them how things were going to be. They, in turn, would tell their father what to do. Robert’s father described *30 his son as behaving properly sometimes, daydreaming other times, and very belligerent when he got into a mood at other times. He added that when Robert got into this mood, he would not listen to anyone.
In regard to Robert’s behavior, his mother told the probation officer that she could never know what would set off her son’s rages. She added that once he gets into his mood, the only way to get him out of it is to make him cry, after which he will calm down. The mother listed some of Robert’s problems in the home, which included playing with knives, threatening the other family members, yelling and not listening to his parents, and losing his temper.
Robert’s mother also told his probation officer about Robert’s slipping into his younger sister A’s bedroom at night. It was stated by A that Robert threatened to kill her if she told on him. The other younger sister, B, told the probation officer that Robert and A were "fooling around” with each other, and on different nights going into each other’s bedrooms. According to the mother, she and her husband did not know about A and Robert’s sexual activities, which took place for over a month, until B told on them.
On July 29, 1975, Robert admitted the allegations of the PINS petition which had been filed against him by his father. On August 12, 1975, it was stipulated by all parties that Robert would be placed at the New York State Division for Youth Facility at Tryon. An order was made by this court and Robert was admitted to Tryon the following day.
On October 7, 1975, Robert’s Law Guardian applied to the director of Tryon for the termination of his placement. The application for release was denied by the director of Tryon on October 9, 1975. The director was of the opinion that Robert was in need of further treatment at the facility. After the application for release was denied, Robert’s Law Guardian filed the subject petition on October 15, 1975 to terminate Robert’s placement, pursuant to section 764 of the Family Court Act. The return date of the petition for termination of placement was October 30, 1975. At that time, Robert’s father stated to this court that if the petition for termination of placement is denied, he would withdraw the PINS petition. Since permitting the withdrawal of the PINS petition would render moot the hearing on the petition for termination of placement, the first issue which must be addressed is whether a petitioner in a PINS proceeding has the right to discontinue *31 the proceeding after adjudication and disposition, and whether the court can allow the discontinuance.
In the instant case, the order being challenged was made pursuant to section 754 of the Family Court Act, which section lists the dispositions available to the court upon an adjudication of a person in need of supervision. Part 6 of article 7 of the Family Court Act is devoted to new hearings and the reconsideration of orders of disposition. Even more specifically, section 764 deals with the manner in which the termination of a placement, such as the one before this court, may be obtained.
Section 764 of the Family Court Act states:
"Any parent or guardian or duly authorized agency or next friend of a person placed under section seven hundred fifty-six or committed under section seven hundred fifty-eight may petition to the court for an order terminating the placement or commitment. The petition must be verified and show:
"(a) that an application for release of the respondent was made to the duly authorized agency with which the child was placed or to the institution to which the respondent was committed;
"(b) that the application was denied or was not granted within thirty days from the day application was made; and
"(c) the grounds for the petition.”
The wisdom of this procedure is a matter which shall be discussed later in this opinion. However, the procedure itself seems quite clear and there is no provision in the statute for the withdrawal of a PINS petition as a method of obtaining the termination of a placement.
Counsel for respondent points to section 165 of the Family Court Act, which provides for the application of provisions of the Civil Practice Law and Rules in Family Court proceedings where the method of procedure is not otherwise prescribed by the Family Court Act. Counsel for respondent would have this court hold that the present case is one which falls within the parameters of section 165 and that CPLR 3217 and 5015, which deal respectively with the discontinuation of claims and the vacation of default judgments on stipulation of the parties, are applicable here.
Section 165 of the Family Court Act states: "Where the method of procedure in any proceeding in which the family court has jurisdiction is not prescribed by this act, the proce *32 dure shall be in accord with the rules adopted by the administrative board of the judicial conference or, if none has been adopted, with the provisions of the civil practice act to the extent they are suitable to the proceeding involved. Upon the effective date of the CPLR, where the method of procedure in any proceeding in which the family court has jurisdiction is not prescribed, the provisions of the civil practice law and rules shall apply to the extent that they are appropriate to the proceedings involved.”
However, the method of procedure for the termination of a placement is prescribed, and there is no need to refer to the CPLR. Merely because the withdrawal of a petition is not among the options open under section 764 to a party wishing to terminate a placement does not mean that this method should be made available by resorting to the CPLR. To do so would allow the circumvention of the probable intent of the Legislature to specifically prohibit withdrawal of a petition as a means of terminating a placement.
Those who may petition the court under section 764 include a parent, guardian or duly authorized agency. These are also the three groups which are by far the most likely to have filed the PINS petition in the first place. Since the Legislature made no provision to permit members of these groups to withdraw a petition as a means of terminating a placement, but rather, required that they follow the procedure described in section 764, this court is not persuaded that withdrawal of a petition should be permitted pursuant to section 165 of the Family Court Act and the CPLR.
A PINS petition is not a device by which parents may summarily have their children disposed of by the court. "A parent in a PINS petition has no divine right to be right. Their actions and conduct must be more carefully screened than those of the accused child.” (Matter of Reynaldo R., 73 Misc 2d 390, 394.) In a PINS proceeding, it is the State which is the true party in interest, not the parent petitioners who are a nominal party representing the interests of the community. (See Matter of Charles C., 83 Misc 2d 388, 392-393.) As was pointed out by the Supreme Court in Prince v Massachusetts (321 US 158, 168), "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers within a broad range of selection.”
*33 The State’s interest in the child’s welfare and moral development is the basis for PINS legislation. Allowing parent petitioners to withdraw a PINS petition on a whim and abruptly put a halt to any beneficial treatment which the child is receiving would make a farce of such noble aims.
It must be proven beyond a reasonable doubt that a child is ungovernable and that he is in need of treatment or supervision before he can be adjudicated a person in need of supervision (Matter of Richard S., 27 NY2d 802). It seems ludicrous that a petition should be permitted to be withdrawn subsequent to such adjudication with no controls whatsoever, thereby nullifying the whole Family Court proceeding.
The present system for modifying and vacating orders of disposition poses no undue hardship upon parent petitioners while at the same time it protects troubled youngsters from being arbitrarily removed from treatment programs by parents with motives other than the best interests of the child. A child has the right to be guided and protected by an enlightened society, and not to be subjected to the caprice of parents whose motives are often questionable at best. Against the parents’ claim of authority in their own household and in the rearing of their children, interests basic in a democracy, stand the interests of society to protect the welfare of children. This "is no mere corporate concern of official authority. It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuse and given opportunities for growth into free and independent well-developed men and citizens.” (Prince v Massachusetts, supra, p 165.)
By requiring a hearing on a motion to modify or vacate an order of disposition, the law provides an orderly mechanism through which facts underlying such motion can be examined and the best interests of the child and the community may be served. Therefore, it is the decision of this court that under the Family Court Act, the petitioner does not have the right to summarily discontinue the placement made in the present case.
Accordingly, the motion to withdraw the original petition and discontinue the action is denied, and the petition to terminate placement is scheduled for hearing at 2:00 p.m., April 14, 1976.