OPINION *Page 3 
{¶ 1} The appellants, Bradley and Amy Honse, appeal the judgment of the Hancock County Common Pleas Court Juvenile Division terminating their parental rights and granting permanent custody of their three children to Hancock County Department of Job and Family Services, Children's Protective Services Unit. On appeal, the Honses contend that the case plan was overly burdensome; that the trial court's decision was not in the best interests of the children and against the manifest weight of the evidence; and that the trial court granted CPSU's motion based on their lack of affluency. For the reasons set forth herein, we affirm the judgment of the trial court.
 {¶ 2} On September 29, 2006, the trial court granted an ex parte order to CPSU for temporary custody of the Honses' three children: K.H., born on May 18, 1998; M.H., born on May 22, 2001; and S.H. born on October 15, 2002. The order was based on allegations that CPSU had had a lengthy history with the Honses concerning issues of neglect; that the Honses had suffered financial difficulties, which affected their ability to maintain safe and stable housing; that the Honses had not followed through with recommended marital counseling; that Brad had not followed through with recommended services to address his anger and anxiety; that the Honses' home was unsafe, overly dirty, and filled with trash; that the children had had unexplained injuries; that Brad had used profanity when *Page 4 
"yelling" at S.H.; and that S.H. had been found in the middle of Blanchard Avenue, a busy five-lane roadway, after the children had been given permission by both parents to walk to a friend's house.
 {¶ 3} Following a hearing held on October 2, 2006, the trial court found that the children should be placed in the emergency temporary custody of CPSU, and that reasonable efforts had been made to prevent removal of the children. The children were adjudicated neglected and dependant in the trial court's judgment entry of October 23, 2006. On November 1, 2006, CPSU filed its case plan for the family, which was amended twice thereafter. Following a dispositional hearing, the children were ordered into the temporary custody of CPSU.
 {¶ 4} On February 26, 2008, CPSU filed a motion for permanent custody, and the hearing was held on October 21, 22, and 23, 2008. The court allowed counsel one additional week to submit their closing arguments in writing. On November 12, 2008, the trial court granted permanent custody to CPSU. The court determined that the children had been in CPSU's custody for at least 12 of 22 consecutive months; that granting permanent custody to CPSU was in the children's best interests; that placing the children with the Honses would be "contrary to the children's welfare; "and that CPSU had made reasonable efforts to "prevent the continued removal of the children from their home" and to "finalize a *Page 5 
permanency plan." The Honses appeal the judgment of the trial court, raising four assignments of error for our review.
 Assignment of Error No. 1 The trial court erred in granting permanent custody to [Hancock County Department of Job and Family Services, Children's Protective Services Unit] because the [CPSU] failed to develop and implement a case plan reasonably calculated to achieve the goal of reunification of the minor children.
 Assignment of Error No. 2 The trial court's decision to terminate the Appellant's [sic] parental rights and grant permanent custody to the Department is against the manifest weight of the evidence.
 Assignment of Error No. 3 The trial court erred in granting permanent custody for the children because the Appellants lack affluency.
 Assignment of Error No. 4 The trial court erred in granting permanent custody for the children because it was not in their best interest.
 {¶ 5} Parents have a fundamental right to care for and retain custody of their children. In re Shaeffer Children (1993), 85 Ohio App.3d 683,621 N.E.2d 426, citing Santosky v. Kramer (1982), 455 U.S. 745,102 S.Ct. 1388, 71 L.Ed.2d 599. The United States Supreme Court has noted, "`[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents[.]'" Stanley v. Illinois (1972),405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551, quoting Prince *Page 6 v. Massachusetts (1944), 321 U.S. 158, 166, 64 S.Ct. 438,88 L.Ed.2d 645. Therefore, permanently removing a child from his or her parents' care is an alternative of last resort, sanctioned only when the welfare of the child requires such action. See In re Wise (1994),96 Ohio App.3d 619, 645 N.E.2d 812; In re Cunningham (1979), 59 Ohio St.2d 100,391 N.E.2d 1034. The "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" In re Hayes (1997),79 Ohio St.3d 46, 48, 679 N.E.2d 680 (quotation omitted).
 {¶ 6} When the agency files a motion for permanent custody, the trial court must hold a hearing and make several findings before terminating parental rights. At the hearing, the trial court must determine:
 by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply * * *
 (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
R.C. 2151.414(B)(1) (emphasis added). In determining the best interest of a child, the trial court must consider the factors found in R.C. 2151.414(D). While a trial court is not specifically required to list each factor considered under *Page 7 
R.C. 2151.414(D), the record must indicate that all of the necessary factors were considered. See In re Hershberger and Smith, 3d Dist. Nos. 1-04-55, 1-04-61, 2005-Ohio 429, at ¶ 28.
 {¶ 7} In reviewing a trial court's decision made under the clear and convincing standard, an appellate court must "examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Id. at ¶ 18, citing Cross v.Ledford (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Clear and convincing evidence has been defined as:
 "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
Id., quoting Cross, at 477, citing Merrick v. Ditzler (1915),91 Ohio St. 256, 110 N.E. 493. However, the trial court "is in the best position to observe the demeanor of the parties, to access [sic] their credibility, and to determine the accuracy of their testimony." In reAdoption of Sours, 3d Dist. Nos. 16-02-16, 16-02-17, 2003-Ohio-3583, at ¶ 10, citing In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 367,481 N.E.2d 613.
 {¶ 8} In the first assignment of error, the Honses essentially argue that CPSU did not make reasonable efforts to reunite the parents and the children under R.C. 2151.419 because the case plan approved by the court was excessive *Page 8 
and set them on the path to failure. The Honses cite no case law to support their position.
 {¶ 9} R.C. 2151.412(F)(1) states:
 All case plans for children in temporary custody shall have the following general goals:
 (a) Consistent with the best interest and special needs of the child, to achieve a safe out-of-home placement in the least restrictive, most family-like setting available and in close proximity to the home from which the child was removed or the home in which the child will be permanently placed.
 (b) To eliminate with all due speed the need for the out-of-home placement so that the child can safely return home.
R.C. 2151.412 (H) provides:
 The case plan for a child in temporary custody shall include at a minimum the following requirements if the child is or has been the victim of abuse or neglect or if the child witnessed the commission in the child's household of abuse or neglect against a sibling of the child, a parent of the child, or any other person in the child's household:
 (1) A requirement that the child's parents, guardian, or custodian participate in mandatory counseling.
 (2) A requirement that the child's parents, guardian, or custodian participate in any supportive services that are required by or provided pursuant to the child's case plan.
 {¶ 10} The case plan approved by the trial court on November 1, 2006, and the amended case plans approved by the court on July 16, 2007 and February 1, 2008 comply with both of the statutory provisions. The first case plan filed in this *Page 9 
case identified eight objectives for the family: 1) the children need a safe and stable living environment; 2) the children need medical and education services; 3) the children need counseling; 4) the parents need additional parenting knowledge and skills; 5) the parents need mental health and substance abuse assessments; 6) the parents need additional life skills; 7) the parents need consumer credit counseling; and 8) Mr. Honse needs anger management services. The amended case plan filed on July 16, 2007 added two additional "family assessment concerns:" that "Mr. Honse has demonstrated controlling and manipulative behaviors towards others. CPSU has received concerns of domestic violence involving Mr. Honse and Mrs. Honse," and that "the parents need their psychological evaluations updated." The amended case plan filed on February 1, 2008 clarified the wording used in the safe and stable housing concern.
 {¶ 11} At hearing, the testimony revealed that the Honses had not satisfied the objective concerning the safe and stable home. Between the time that the children were removed from their custody until the time of the hearing, Brad and Amy lived at four different addresses. The home they were purchasing at the time the children were removed had been lost in foreclosure;[1] the next address was a *Page 10 
temporary residence, which was owned by a friend who had been convicted of a fifth-degree felony sexual offense;[2] the third address was a nice residence but cost $900 per month, which was ultimately too expensive for the Honses; and finally, the Honses moved to the fourth address shortly before the hearing, and that residence cost only $350 per month and provided appropriate accommodations for the children.
 {¶ 12} The second and third objectives were directed toward the foster parents. Although the Honses were instructed to attend appointments as requested, the uncontroverted evidence demonstrated that the Honses were never asked to attend any of the children's appointments.
 {¶ 13} The fourth objective stated that the Honses needed "additional parenting knowledge and skills." As part of the objective, the Honses were *Page 11 
required to "complete all recommended programs" and to "follow all recommendations." Mark Olthouse, the case worker from HCDJFS, had worked with the Honses for four years. He testified that both he and the home-based therapist had recommended consumer credit counseling services to the Honses, which they did not complete. The Honses' failure to complete credit counseling led Olthouse to conclude that they had not satisfied the fourth objective.
 {¶ 14} David Connell, a clinical psychologist, testified that Brad loved his children, cared about them, and had appropriate responses to questions, but he had other issues that prevented him from being as involved with the children as he should be. Connell also opined that the Honses' marriage was detrimental to their ability to effectively parent the children.
 {¶ 15} Catherine Bouillon, the home-based therapist, testified that the parents were unable to place the children's needs ahead of their own. As an example, Bouillon stated that the Honses asked if they could get a pet alligator for Christmas. Apparent in the record was a sense of disbelief that the parents would even make such a request. Bouillon stated that she never saw an alligator in the home, but one of the children disclosed that the alligator had been brought into the home and hidden during the home-based therapy sessions. Bouillon stressed the incident with Brad's friend entering the home as a major issue as well. She also discussed the parents taking the children to McDonald's and Wal-Mart during a *Page 12 
time when she was supposed to check-in during an unsupervised visitation. However, she conceded that the parents were not restricted from taking the children from the premises during their visitation times.
 {¶ 16} Bouillon stressed Brad's anger as an issue, referring to his "escalation." As an example, she stated that during a supervised visit at the Harmony House, Brad had pulled S.H. on a toy in a manner that she deemed to be too rough. Bouillon testified that she "just didn't care for the way" Brad and S.H. were interacting, but S.H. had not been harmed, and Brad had become frustrated and "escalated" the situation to the point that security had been required to remove him from the premises. Bouillion stated that Brad's behavior was a problem because he was a big man and he "could possibly look intimidating." Bouillon discussed the fact that Brad eventually began to see her as an adversary. Bouillon opined that the Honses had too many barriers to overcome, and despite her services, they remained unable to put the children's needs first.
 {¶ 17} Rebecca Shumaker testified that she worked with the Honses as a home-based parent educator prior to Bouillon's involvement in the case. She testified that she had been involved with the Honses since January 2003 and that there were times when she had been in the home five times per week. Shumaker stated that as of April 2006, the parents were unable to apply the information she *Page 13 
had provided to them to help them become better parents. For all of these reasons, the fourth objective was not satisfied.
 {¶ 18} The fifth objective required the Honses to get mental health and substance abuse assessments. Olthouse testified that both Brad and Amy had completed the assessments, but they had failed to follow through with the recommendations as required by the case plan. Robin Brown, a licensed, independent social worker at Century Health performed a psychiatric evaluation of Brad in December 2006. At that time, Brown recommended that Brad complete the Life Skills group and workbook, anger management, and individual counseling, and that he use the psychiatric medication services. Although Brad did begin a medication regiment, he completed only seven of the twelve Life Skills sessions, did not complete anger management, and did not complete individual counseling. Brown admitted that Amy had completed all of her Life Skills sessions.
 {¶ 19} Connell stated that Amy was not sophisticated, but she was capable of parenting. Amy suffered severe depression, several phobias, and had dependent personality traits. Connell recommended that Amy receive a full physical and dental evaluation because he believed physical and dental problems were causing or contributing to her mental health issues.[3] Connell testified that Amy should *Page 14 
have followed through with any recommended treatment regardless of the cost as resolution of the medical and dental issues were imperative to her mental health. Brad had difficulty with authority figures, felt persecuted, was mistrustful of the world, and had difficulty dealing with the children's needs. Connell diagnosed Brad with obsessive compulsive disorder and antisocial personality disorder. In August 2007, Connell reevaluated the Honses and found no changes. Finally, Connell testified that the Honses' marital problems (specifically, Brad's issues with defiance and anger and Amy's issues with being passive and dependent) were detrimental to their ability to parent their children. For all of these reasons, the fifth objective was not satisfied.
 {¶ 20} The sixth objective was that the parents needed additional life skills. Olthouse testified that Brad had completed only seven out of twelve sessions in the Life Skills group, and although Amy had completed the Life Skills sessions, she had not developed the skills. Olthouse deemed the sixth objective unsatisfied.
 {¶ 21} The seventh objective was that the parents needed consumer credit counseling. Olthouse testified that the Honses had not completed an intake evaluation or any sessions at the Family Resource Center. He stated that he had regularly recommended credit counseling to the Honses, and that Bouillon had recommended credit counseling. Brad and Amy both testified that they had gone to the Family Resource Center and talked to Roxy. Brad stated that Roxy had *Page 15 
assessed their bills and income and concluded that she would be unable to help them because their bills exceeded Brad's income. No documentation of the alleged visit to the Family Resource Center was provided.
 {¶ 22} The eighth objective focused on Brad's anger management problems. As part of the objective, Brad was to "apply for and receive anger management services from Century Health or another agency-approved service provider." The testimony was undisputed that Brad never sought anger management services. Although he was taking medication to help control his mood, he had not satisfied the eighth objective.
 {¶ 23} This record shows that CPSU made significant attempts to help the Honses correct the issues that caused the children's removal. The objectives that were focused on the parents were not unreasonable and were designed to comply with the mandate of R.C. 2151.412(H) and the goals expressed in R.C. 2151.412(F)(1)(a)-(b). As such, the first assignment of error is overruled.
 {¶ 24} The second, third, and fourth assignments of error can be considered together. In the second assignment error, the Honses argue that the trial court's judgment is against the manifest weight of the evidence. In the third assignment of error, the Honses argue that the trial court erred by terminating their parental rights due to their lack of affluency, and in the fourth assignment of error, the Honses contend that the grant of permanent custody to CPSU was not in the *Page 16 
children's best interests. We have outlined the pertinent evidence above. We would note that both Brad and Amy claimed to be unaware of some of the requirements of the case plan. However, they had been represented by legal counsel at least since the time the children were removed from the home and placed in CPSU's temporary custody. As we stated earlier, the trial court was in the best position to assess credibility, and it apparently believed the agency's witnesses, whose testimony revealed that certain aspects of the case plan remained unsatisfied by the Honses. Several witnesses also testified that the Honses would not benefit from any additional time in therapy because they had been unwilling to change their ways during the pendency of the case and because the children's mental health were beginning to deteriorate as a result of the uncertainty in their lives.
 {¶ 25} In its judgment entry, the trial court noted that it had considered all testimony and evidence from the hearing. The court had considered all relevant statutory sections, including R.C. 2151.414(D)(1)-(5) and 2151.414(D)(7)-(11). While the court may have considered Brad and Amy's lack of affluency, the important aspect of that consideration was not that they lacked income and/or assets but that they were unwilling to learn how to manage their limited resources. The court specifically considered:
 the prolonged period of time the children have been in custody without any improvement in the parent's [sic] child rearing *Page 17 skills. A contributing factor being father's diagnosed condition of obsessive-compulsive disorder and antisocial personality disorder and the mother's limited intelligence along with unresolved physical issues. The Court further has considered the parent's [sic] inability to maintain safe and stable housing. * * * There is little doubt that the parents love their children and the children have expressed a desire to be reunited with the parents but despite considerable efforts by the agency and other care providers the situation with the parents is basically unchanged from the date of original removal.
 {¶ 26} CPSU proved its case by clear and convincing evidence;[4]
specifically, the parents' failures to make changes in their lifestyles to improve their abilities to manage their affairs and the children. For these reasons, the second, third, and fourth assignments of error are overruled.
 {¶ 27} The judgments of the Hancock County Common Pleas Court Juvenile Division are affirmed.
Judgments Affirmed
 ROGERS, J., concurs.
[1] Both Brad and Amy admitted that the mortgagor foreclosed on the property. However, Brad testified that the mortgage had been sold to a different mortgagor without the Honses' knowledge. Brad stated that the Honses had made all mortgage payments to the original mortgagor, as they were unaware of the sale, and the new mortgagor foreclosed on the property for non-payment despite their payments made to the original mortgagor.
[2] The record reveals that Brad had known this friend since elementary school; that the friend gave Brad a ride to and from work each day; that the friend had no contact with the children; that the friend owned the residence but did not live there or visit; that the friend did not charge them rent during the time they lived in his property; that the friend's conviction was over ten years old; that the friend's civil rights had been fully restored; and that the friend, who had been classified as a sexually oriented offender, was no longer required to comply with sex-offender registration statutes. The home-based therapist testified that the friend came to the Honses' residence during one of her visits. She claimed Brad had contacted the friend and asked that he bring over a lighter. She also testified that the friend entered the residence without knocking, did not have contact with the children, and left within a few seconds. Brad testified that the friend had asked him for a lighter, and Brad had indicated that he would be unable to deliver the lighter because the children were visiting. Both Brad and Amy stated that the friend had unexpectedly dropped by during visitation. We note that none of the case plans prevented the Honses from associating with people with criminal backgrounds. Each case plan provided under the "safe and stable living environment" objective that "any person living with or spending thenight in Mr. and Mrs. Honses' home will sign a release of information for a criminal background check; "and that "Mr. and Mrs. Honse will notlive with any person with a history of child abuse, child neglect, assaultive behavior or drug convictions." (Emphasis added). None of these restrictions prevented Brad from maintaining his friendship, and none of these restrictions prevented the Honses from living in a property owned by the friend when the friend did not live in the same residence, did not spend the night in the residence, and did not charge the Honses rent during their temporary stay.
[3] Amy's dentist estimated that the dental treatment she needed would cost approximately $6,000.
[4] While not speaking for my colleagues, I note that some of the evidence in this case appeared to be escalated or exaggerated so as to give the appearance of a significant problem from a minimal behavior. For example, several of the witnesses seemed offended that the parents simply asked whether they could have a pet alligator. While I do not condone a pet alligator in the home with small children, merely asking if they could get the pet does demonstrate that the parents were seeking guidance from the people who were supposedly involved to "help" them. I also find Bouillon's testimony that Brad and S.H. were playing in a manner she "just didn't care for" to be irrelevant when S.H. was unharmed, and Bouillon was unable to point to a specific problem with Brad's interaction with his son while they were playing. Finally, I note that Bouillon was allowed to speculate that Brad was a big man who "could possibly look intimidating" while offering no evidence that 1) he actually did look intimidating, or 2) that he actually was intimidating. Her testimony essentially amounted to double speculation. Although I do not minimize the legitimate concerns about this family, I can at least empathize with Brad's feeling that he had been placed in an adversarial situation. Despite my objection to speculative and exaggerated statements in such a serious case, I believe there was other sufficient evidence on the record to support the trial court's determination. *Page 18