IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-615

Filed 06 June 2023

Rutherford County, Nos. 21JA20, 21JA21, 21JA22

IN THE MATTER OF: M.S., L.S., A.S., Minor Children.

Appeal by defendant from judgment entered 28 April 2022 by Judge Corey J.
MacKinnon in Rutherford County District Court. Heard in the Court of Appeals
9 May 2023.

*Hanna Frost Honeycutt, for the petitioner-appellee.*

*Attorney for GAL, Matthew D. Wunsche, for the other-appellee.*

*Gillette Law Firm PLLC, by Jeffrey William Gillette, for the respondent-appellant.*

*Emily Sutton Dezio, PA, by Emily S. Dezio, for the respondent-appellant.*

TYSON, Judge.

Respondent-Mother ("Mother") and Respondent-Father ("Father") appeal from
a disposition and adjudication order entered on 28 April 2022, which ceased DSS's
reunification efforts and all visitation of Mother and Father with their three children.
We affirm in part, vacate in part, and remand.

## I. Background

Rutherford County Department of Social Services ("DSS") obtained custody of
Mother's and Father's three children, six-year-old Micky, five-year-old Lucy, and
three-year-old Annette, on 7 February 2021. *See* N.C. R. App. P. 42(b) (pseudonyms

used to protect the identity of minors).

DSS received a report on 8 January 2021 alleging Mother and Father suffered from substance abuse issues, engaged in a history of domestic violence, and their home lacked electricity. DSS received another report three days later alleging improper supervision of the children, alcohol abuse by Father, and asserting Mother was often covered in bruises. A third report was received in early February and alleged Father had assaulted one of the minor children while visiting Father's family in Michigan and an "amber alert" was subsequently issued.

DSS investigations revealed a history of domestic violence between Mother and Father. The youngest child, Annette, who was one year old at the time, tested positive for methamphetamines two days after being removed from Mother's and Father's home. DSS also discovered Mother's and Father's parental rights had been terminated in Michigan for five other minor children: two children were Father's biological children, two children were Mother's biological children, and one was the biological child of both Mother and Father.

Shortly after DSS began investigating, Mother agreed to reside in the local PATH shelter to protect herself and the juveniles from Father, given the recent assault charges and amber alert accusations in Michigan. Mother left the PATH shelter after only a few days. DSS filed juvenile petitions for neglect, took custody of the children, and asserted:

> The Department received reports regarding this family on

January 10, 11, and February 4, 2021. These reports included concerns of domestic violence, improper discipline, improper care, and substance use. The allegations were denied by the family. Throughout the assessment it was found that the family has significant history in Michigan. The parents were TPR'd [sic] on in Michigan due to sexual abuse. Throughout the assessment the professional collaterals had serious concerns for the children, due to being around [Father]. The family fled Michigan when they found out they were pregnant with [Micky], for fear that Michigan DSS would take this child. Due to severe concerns of domestic violence and sexual abuse and the children not being verbal, Social Worker [sic] scheduled a medical exam for the children. Before this exam took place, the family fled to Michigan. The report received on February 4, 2021, had serious concerns of substance use and domestic violence. Social Worker [sic] has not been able to reach or locate the family since the last week of January 2021. There are serious concerns regarding the risk of harm to these children based on the history of the parent's behavior with no evidence of treatment or behavior[al] change.

An order for nonsecure custody was entered because Mother and Father had "created conditions likely to cause injury or abuse or has failed to provide or is unable to provide, adequate supervision or protection." The juveniles were adjudicated as neglected for living in an environment injurious to their welfare pursuant to N.C. Gen. Stat. § 7B-101(15)(e) (2021).

The 9 February 2021 order on need for continued nonsecure custody provided Mother and Father should receive one hour of supervised visitation each week.

Father's case plan provided he:

a) Agrees to complete a domestic violence batterer's assessment and take classes if recommended by the

provider.
b) Agrees to abide by the no-contact order in place between him and the children's mother, [ ].
c) Agrees to complete a Comprehensive Clinical Assessment (CCA) and follow all recommendations.
d) Agrees to complete a Sex Offender Evaluation.
e) Agrees to submit random drug screens within 24 hours of the request.
f) Agrees to maintain appropriate housing.
g) Agrees to actively seek employment and notify the Social Worker of submitted job applications and interviews.

Mother's case plan on 17 February 2021 provided she:

a) Agrees to complete a domestic violence victim's assessment and take classes if recommended by the provider.
b) Agrees to abide by the no-contact order in place between her and the children's father, [ ].
c) Agrees to participate in and graduate from parenting classes.
d) Agrees to complete a Comprehensive Clinical Assessment (CCA) and follow all recommendations.
e) Agrees to engage in therapy.

Mother attended one hour of supervised visitation. Nothing was noted in the record of any issues arising during that visit. A DSS witness testified shortly after that visit, Annette and Lucy began experiencing asserted "sexualized behaviors." Visitation was ceased after a pre-adjudication hearing held on 16 March 2021. The pre-adjudication order found:

4. That the minor child and siblings have been exhibiting sexualized behaviors that are not appropriate for their ages.

5. That the Department has obtained TPR orders from the State of Michigan regarding other minor children where

the respondent parents had their rights terminated due to sexual abuse of those children and allowing the sexual abuse to occur.

6. That the potential harm to the minor child is greater than the benefit of visitation occurring at this time.

A hearing was held on 22 March 2022. DSS called several witnesses, including social workers, a foster care worker, foster care parents for the children, and the officer who had dealt with several domestic violence calls at Mother's and Father's home. Certified copies of the petitions and orders terminating Mother's and Father's parental rights to other children in Michigan were entered. Evidence at trial indicated Mother failed to acknowledge Father's domestic violence:

> [DSS ATTORNEY]: And did you ask the Respondent Mother about the domestic violence?
>
> [SOCIAL WORKER]: I did.
>
> [DSS ATTORNEY]: Okay. What was her answer?
>
> [SOCIAL WORKER]: She denied it. I'd spoke to her multiple times just offering my help if she needed it and she continuously denied it. I believe she actually told me there was some domestic violence in the past but that he was better now.

The trial court made identical findings for all three children and found:

> 8. That the Department received a report on the 8th of January, 2021 alleging substance abuse in the home and a lack of power at the residence.
>
> 9. That the social worker went to the home and found the home to be without running water. That the home did have power.

10. That all three children and the respondent parents were at the home.

11. That another report was received on the 11th of January, 2021 alleging improper supervision and alcohol abuse.

12. That the social worker went to the residence and noticed the respondent mother to be visibly upset and that she acts differently when the respondent father is present for the conversation.

13. That there is a history of 911 calls out to the house regarding domestic violence.

14. That the respondent father was charged with disorderly conduct and assault on a female after an incident in December of 2020.

15. That during that incident Officer James Greene found the respondent father in the middle of the road yelling obscenities towards another gentleman. He stopped to talk to the respondent father and the respondent father told him that the officer should go and check on his wife.

16. Officer Greene suspected that he was under the influence based on his behaviors.

17. Office[r] Greene arrived at the home where the respondent mother and three minor children were present. He observed the respondent mother to be beaten up with a blood[y] lip and bleeding from the side of her eye. The respondent mother stated the respondent father assaulted her. She was offered but refused medical care.

18. The assault on a female was ultimately dismissed due to the respondent mother's failure to cooperate with the prosecution.

19. That part of his bond release conditions was to not have

any contact with the respondent mother. He violated this condition on multiple occasions.

20. That when questioned by the social worker about the domestic violence, the respondent acknowledged a prior history of domestic violence but denied any current issues.

21. That the Department received another report alleging the respondent father assaulting one of the minor children and the respondent mother while they were in Michigan at the paternal grandmother's house. That an amber alert was issued on the 4th of February, 2021.

22. That the family returned to North Carolina and the social worker went to the home on the 6th of February, 2021.

23. That during this home visit the respondent mother stated that " [Father] is not well right now," referring to the respondent father. She stated that he is a "whole other person" and "needs help."

24. She denied the incident of domestic violence[,] but the social worker noticed a bruise on the respondent mother's arm.

25. The respondent mother did not allow a photograph to be taken of the bruise.

26. That the respondent father was in jail on this date, but bonded out on the 7th of February, 2021. That the social worker talked to the respondent father[,] and he acknowledged a history of domestic violence but stated it was in the past.

27. That the respondent mother agreed to go to the PATH Shelter with the minor children.

28. That she ultimately did not stay at the PATH Shelter and the Department took custody of the minor children.

29. That the social worker obtained DSS records from the State of Michigan. The respondent parents had their parental rights involuntarily terminated for multiple minor children due to the respondent father sexually abusing a minor child and physically abusing another minor child. The respondent mother allowed the abuse.

30. The records also indicate a history of domestic violence between the respondent parents while residing in Michigan.

31. That there are no records to indicate the respondent father received any type of sex offender treatment to address the concerns from the prior case.

32. The respondent parents moved to North Carolina shortly after their rights were terminated in Michigan.

33. That on the 9th of February, 2021, the minor child [Annette] was drug screened and her hair was positive for methamphetamines.

34. That after the minor children were placed in the custody of the Department[,] they were placed in foster home.

35. That the minor children had significant delays and were assessed to need speech and occupation therapy. None of the minor children were able to communicate verbally.

. . . .

37. The minor child, [Lucy], was placed by herself in a foster home. The foster mother observed her to have nightmares and to be scared of the bathroom.

38. She also observed [Lucy] to push toys against her private area and that she would grind her private area on the side of the bathtub.

39. She was also observed to keep her legs tightly crossed and could be heard say "no no" at night.

40. On one occasion she was given lotion after a bath[,] and she immediately went to rub the lotion on her private area.

41. On another occasion, she was handed a phone and immediately pointed the camera at her private area.

42. That [Lucy] demonstrated sexualized behaviors that are not age appropriate.

43. That initially, [Anette] and [Micky] were placed together in a foster home.

44. The foster parents observed [Micky] to have severe physical tantrums and to be non-verbal. That he would have nightmares where he would start screaming. That he was 4 at the time.

45. That [Micky] would have food aggression.

46. That he avoided bath time and had to be carried in the bathroom to be cleaned.

47. That [Annette] was observed to have fear of everyone, especially males. That she would scream and cry a lot.

48. That she, like her siblings, did not want to take a bath. The placement had to use baby wipes to clean her for the first few weeks while in their care.

49. She also demonstrated sexualized behaviors of rubbing her private area against her car seat, high chair, and in the bathtub.

50. She had nightmares every night and would wake up drenched in sweat. She could be heard saying "no."

51. That the foster parents observed [Micky] and [Anette] not to have a sibling bond.

52. That all of the minor children have significant delays.

53. That there is a long-standing history of domestic violence between the respondent parents and these children have been exposed to the domestic violence. There was at least one incident of significant domestic violence in front of the minor children in North Carolina.

54. All three children exhibit overly sexualized behaviors for their age.

55. The Court took Judicial Notice of 20 CR 53048.

56. That the minor child named above is a neglected juvenile as defined by N.C. G[en.] S[tat.] § 7B-101(15).

During the dispositional hearing held on the same day, a foster care worker testified regarding Mother's and Father's compliance with their case plans. The possibility of other family members obtaining custody of Micky, Annette, and Lucy was also discussed.

At the disposition hearing, the trial court found these additional facts:

7. That as of March 22, 2022, the respondent mother has not completed any of the [case plan] items. She has not engaged in domestic violence classes even though DSS has provided her with the contact information for the program.

8. That the no contact order was dismissed and the respondent mother is now living with the respondent father again. They are both homeless or living in different motels when they have the money. They can be found walking on the trail or sitting at Wal-Mart holding signs asking for money.

9. That DSS made a referral for the respondent mother to complete her Comprehensive Clinical Assessment[,] but

she never followed through with this.

10. That DSS made another referral[,] and the respondent mother completed the assessment on October 8, 2021 but did not return for services until the dates listed below: February 14, 2022 (Outpatient therapy), February 21, 2022 (outpatient therapy), March 11, 2022 (medication management) NO SHOW, March 25, 2022 (Outpatient therapy.

11. That the respondent mother has refused drug screens on two separate occasions.

12. That the respondent mother has not made any progress on her case plan. She does sometimes attend court in this matter.

. . .

14. That as of March 22, 2022, the respondent father has submitted one drug screen at the beginning of the case. He completed a domestic violence batterer's assessment and was recommended to participate in batterer's classes. The respondent father has not followed through with his classes or completed any of the other items listed above.

15. That the respondent father completed an assessment for the Batterer's Intervention Program in April 2021 but did not return to begin classes. He has since been discharged.

16. That he did not obtain a sex offender evaluation.

17. That the no contact order was dismissed[,] and the respondent mother is now living with the respondent father again. They are both homeless or living in different motels when they have the money. They can be found walking on the trail or sitting at Wal-Mart holding signs asking for money.

18. That the respondent father has a criminal court date of

April 11, 2022 to address the current pending charges. If convicted[,] his probation will be revoked[,] and he will be looking to serve jail time. The respondent father also has a felony charge that will be addressed after the April 11, 2022 court date.

1[9]. That the respondent father reports he is engaged in TASC services[,] but he has not signed a release for DSS to receive this information. That the respondent father's probation officer reports he is not passing drug screens.

[20]. That the respondent father has not made any progress on his case plan.

[21]. That a Court Report for the Dispositional Hearing was received into evidence and reviewed by the Court, and the facts contained in said summary are incorporated herein as further findings of fact. The Court Report, marked as Exhibit "A", is attached hereto and incorporated herein by reference.

2[2]. That the Department has made reasonable efforts towards the permanent plan of reunification in this matter.

2[3]. That reasonable efforts for reunification have been made by the agency to include: development of the Out of Home Service Agreement for the respondent mother; Child and Family Team Meetings, home visits, and other services as described in the attached court report.

2[4]. That the conditions which led to the placement of the Child in DSS custody still exist and the return of the Child to the home of the respondent parents would be contrary to the welfare of the Child at this time. That the respondent father is appropriate for a trial home placement.

2[5]. That it is in the best interest of the Child to remain in the custody of Rutherford County Department of Social Services.

2[6]. That the recommendation for th[ese] [juveniles] is a

plan of non-reunification and to come back within 30 days
to set a permanent plan for the minor child[ren].

2[7]. That both respondent parents have had their parental
rights involuntarily terminated in Michigan. That neither
testified in this matter.

The trial court adjudicated all minor children as neglected under N.C. Gen. Stat. § 7B-101(15) (2021). The trial court concluded grounds existed for the termination of parental rights under N.C. Gen. Stat. § 7B-901(c) (2021). Mother and Father timely appealed.

## II.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2021).

## III.    Issues

Father argues several findings of fact are not supported by competent evidence. He also argues the evidence, taken as a whole, fails to support an adjudication of neglect.

Father and Mother both argue the trial court erred by ceasing reunification efforts in the initial dispositional orders. They argue the trial court improperly based its decision on the involuntary termination of Mother's and Father's parental rights for the five other children in Michigan.

Father and Mother both assert the district court abused its discretion by ordering no visitation between the parents and their children.

## IV.    Neglect Adjudication

Father challenges several findings of fact, including findings of fact 12, 14-17 and 24. He argues those findings of fact are not supported by competent evidence. Without those facts, Father argues the findings of fact only demonstrate a "raw suspicion" of domestic violence, and no evidence exists to demonstrate direct violence.

**A. Standard of Review**

In reviewing an adjudication order, this Court must determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations and internal quotation marks omitted). "In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997).

Unchallenged findings of fact are presumed to be supported by sufficient evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

**B. Analysis**

"The allegations in a petition alleging that a juvenile is abused, neglected, or dependent shall be proved by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2021).

### *1. Finding of Fact 12*

Finding of fact 12 provides: "the social worker went to the residence and noticed the respondent mother to be visibly upset and that she acts differently when the respondent father is present for the conversation."

The DSS attorney asked the social worker about Mother's demeanor during direct examination. The social worker answered: "Most of the time when I went to the home [Mother] was upset and crying, just tearful most of the time." On redirect, the DSS attorney had the following exchange with the social worker:

> [DSS ATTORNEY]: All right. And on your first, I'm looking at your dictation again, and on your first trip out there [Father] was there when you first arrived but he had to leave for a little bit and you described that when he left . . . Respondent Mother, began to cry?
>
> [SOCIAL WORKER]: Yes.
>
> [DSS ATTORNEY]: She was upset. Do you remember that?
>
> [SOCIAL WORKER]: I do.
>
> [DSS ATTORNEY]: And did she state why she was upset?
>
> [SOCIAL WORKER]: She never really would. I remember specifically multiple home visits, me going and her crying for no alleged, I mean she never really gave me a reason as to why she was so upset.

The social worker testimony revealed her multiple personal observations and rationally-based perception regarding Mother's behavior. Finding of Fact 12 was based on clear, cogent, and convincing evidence. Father's argument is without merit.

### 2. *Findings of Fact 14-17*

Father also argues findings of fact 14-17 are not supported by clear, cogent, and convincing evidence. Those findings of fact collectively describe Officer Greene's encounter with Father in late 2020 and his follow-up encounter with Mother. Father asserts Officer Greene's testimony omits the date the domestic violence incident occurred, and the trial court's finding was not based on clear, cogent, and convincing evidence. Officer Greene testified to the following at trial:

> [DSS ATTORNEY]: Officer Greene, I'm going to show you a shuck, criminal file. Is this the one where you took out the charge?
>
> [OFFICER GREENE]: Yes, sir.
>
> [DSS ATTORNEY]: Okay. And can you just tell me the events of how that charge came about that day?
>
> [OFFICER GREENE]: That day we dealt with [Father]. He was in front of Tri-City Motel on the East, at the intersection of East Main Street and Ledbetter Road in our city limits of Spindale. We got a call about a subject being disruptive in the middle of the roadway. Myself and my partner, Officer Edwards, got there. [Father] was in the middle of the roadway shouting obscenities towards Tri-City Motel. We asked [Father] on several occasions to step out of the roadway. He didn't listen. We then placed him under arrest for [being] disruptive and shouting obscenities towards the hotel. And at the time during his arrest he made the comment to me that I need to go check on his wife at the residence and that's where the charge came from when I went to check on his wife at the residence after we had arrested him for the other charge.
>
> [DSS ATTORNEY]: Did you go, did you go check on his wife?
>
> [OFFICER GREENE]: I did, at 175 Illinois Street.

[DSS ATTORNEY]: So what was the scene when you arrived?

[OFFICER GREENE]: When I got there it was dark inside the residence, knocked on the door. [Mother] came to the door and let us in. Well, actually she didn't let us in. She knocked on the door and we walked [sic], was checking on her to make sure she was okay. Opened the door, seen her sitting on the couch. It was dark in there. She had her three children in there with her and she was beat up in her face, eye swelled up, bleeding from her lip, from the side of her eye. I asked her then did she need medical treatment. She didn't want medical treatment. She didn't want us to be there. I asked her what had happened and she stated that her and her husband, [Father], had got into an argument and he had assaulted her but she didn't want to press charges against him.

[DSS ATTORNEY]: Did [Father], so was he being carried to the jail?

[OFFICER GREENE]: Yes, he was already in custody at the county jail at the time, yes.

[DSS ATTORNEY]: So when he told you to go check on his wife, I mean that's kind of an abnormal thing to say –

[OFFICER GREENE]: It was.

[DSS ATTORNEY]: – after being arrested. Did he offer any explanation?

[OFFICER GREENE]: He didn't. He just stated a couple of times you may want to go check on my wife.

Officer Greene's testimony was based on personal observations and provided clear, competent and convincing evidence to support the trial court's findings of fact. Officer Greene was presented with the criminal file of the charges he initiated at trial

and testified about what he had remembered from the encounter. Later, during the testimony of the social worker, the court acknowledged the incident had actually occurred in November 2020:

> THE COURT: Any other follow-ups? You said that it was January. Are we talking about January of '21?
>
> THE WITNESS: Yes.
>
> THE COURT: So after the criminal charge which was looks like November of –
>
> THE WITNESS: Yeah.

Whether the trial court's findings indicate the exact date the incident occurred does not affect the underlying validity of the findings. A minor error about the exact date upon which a domestic violence incident occurred is not prejudicial. *In re Clark*, 72 N.C. App. 118, 126, 323 S.E.2d 754, 759 (1984) (explaining any "ambiguity" in the evidence or findings of fact regarding the exact date of an assault are "minor" and "non-prejudicial"). Additionally, the children's court reports provide the exact day Father was arrested on 19 November 2020. Father's argument is without merit.

### 3. *Finding of Fact 24*

Father lastly asserts finding of fact 24, which provided Mother "denied the incident of domestic violence[,] but the social worker noticed a bruise on the respondent mother's arm," was based on improper hearsay evidence. Father's argument refers to the following exchange:

> [DSS ATTORNEY]: When you went to see the Respondent

Mother when they got back from Michigan, did you observe any marks or bruises on her?

[SOCIAL WORKER]:  In reading the dictation on-call did. She observed a bruise on her arm.

[DSS ATTORNEY]:  Did anyone ask the Respondent Mother about the bruise?

[SOCIAL WORKER]:  They did.  They asked what happened and –

[FATHER'S ATTORNEY]:  Objection.  This is hearsay.

THE COURT:  Who – are you testifying about the conversation you had with her or –

[SOCIAL WORKER]:  No, just what was in dictation from the on-call social worker.

[FATHER'S ATTORNEY]:  I'd ask to *voir dire* (inaudible).

THE COURT:  I'm going to actually sustain the objection but, sure.

The record indicates Father objected to any testimony regarding what the social worker had *asked* Mother about the bruise, which the Court sustained as hearsay.  Finding of fact 24 is instead based upon the statement elicited *prior to* the hearsay objection, which asserted the social worker had observed a bruise on Mother's arm.  Father failed to object to this portion of the testimony at trial.  His argument is overruled.

## V.    Ceasing Reunification Efforts

Father and Mother each argue the trial court erred by ceasing reunification

efforts pursuant to N.C. Gen. Stat. § 7B-901(c).

## A. Standard of Review

If the trial court follows the factors in the statute and enters supported findings of fact, a trial court's permanency planning decision to cease reunification efforts pursuant N.C. Gen. Stat. § 7B- 901(c) is reviewed for an abuse of discretion. *In re B.R.W.*, 278 N.C. App. 382, 409, 863 S.E.2d 202, 221 (2021) (explaining "as long as the trial court considers the factors as required by N.C. Gen. Stat. § 7B-901(c) and makes the appropriate findings, we can find no abuse of discretion by the trial court's decision"), *aff'd*, 381 N.C. 61, 871 S.E.2d 764 (2022).

## B. Analysis

Our General Assembly amended the statute governing dispositional hearings in 2015. The current version of the statute provides:

> (c) If the disposition order places a juvenile in the custody of a county department of social services, the court *shall direct* that *reasonable efforts for reunification* as defined in G.S. 7B-101 *shall not be required* if the court makes written findings of fact pertaining to any of the following, unless the court concludes that there is compelling evidence warranting continued reunification efforts:
>
> . . .
>
> (2) A court of competent jurisdiction has terminated involuntarily the parental rights of the parent to another child of the parent.

N.C. Gen. Stat. § 7B-901(c)(2) (2021) (emphasis supplied).

Here, the trial court concluded: "a ground exists under N.C.G.S. 7B-901(c) and

therefore a reunification plan is not appropriate in this matter. That no compelling interest exists to order a plan of reunification." The court made no findings on reasons, culpability, or temporal proximity of that ground to conclude "no compelling interest exists to order . . . reunification," where the constitutional safeguards and the statute mandates "the court *shall direct* that *reasonable efforts for reunification*" be made. *Id.* (emphasis supplied).

Mother argues she was not bound by her case plan because she never signed it. The record on appeal does not contain any case plan which bears the Mother's signature. Father's attorney cross-examined the foster care worker on this issue. The social worker testified each time she contacted Mother and Father she would "go over their case plans and discuss[:] are you guys working on this, what can I help you with, do I need to call and make appointments, those types of things, so they were aware of what was on their case plans."

The social worker testified Father and Mother had failed to comply with the vast majority of their case plans, and neither parent had fully completed a single item therein. The trial court found Mother had initialed many of the aspects of her purported plan, but had failed to follow up on or complete the requirements. The trial court also found the conditions which led to the children's placement in DSS custody still existed, and Mother and Father had failed to address the issues which led to the children's removal. DSS entered into evidence certified copies of the petitions and orders from Michigan terminating Mother's and Father's parental rights to other

children.

Respondents have failed to show the trial court prejudicially erred by not ordering DSS's reunification efforts be continued under N.C. Gen. Stat. § 7B-901(c)(2). *In re B.R.W.*, 278 N.C. App. at 409, 863 S.E.2d at 221.

## VI.    Visitation

Father and Mother both assert the district court abused its discretion by ordering no visitation with their children.

## A. Standard of Review

If the trial court follows the factors and mandates in the statute and case law and enters supported findings of fact, "appellate courts review the trial court's dispositional orders of visitation for an abuse of discretion, with an abuse of discretion having occurred only upon a showing that the trial court's actions are manifestly unsupported by reason." *In re L.E.W.*, 375 N.C. 124, 134, 846 S.E.2d 460, 468 (2020) (citations, internal quotation marks, and alterations omitted); *accord In re J.H.*, 244 N.C. App. 255, 269, 780 S.E.2d 228, 238 (2015) ("We review a trial court's determination as to the best interest of the child for an abuse of discretion.") (citation and quotation marks omitted).

"Abuse of discretion exists when the challenged actions are manifestly unsupported by reason." *In re S.R.*, 207 N.C. App. 102, 110, 698 S.E.2d 535, 541 (2010) (citation and internal quotation marks omitted); *see also In re A.J.L.H.*, __ N.C. __, at __, 884 S.E.2d 687, 695-96 (2023).

## B. Analysis

When reunification is not required pursuant to N.C. Gen. Stat. § 7B- 901(c), subsection (d) provides that the "court shall schedule a permanency planning hearing within 30 days to address the permanent plans in accordance with G.S. 7B-906.1 and G.S. 7B-906.2." N.C. Gen. Stat. § 7B- 901(d).

N.C. Gen. Stat. § 7B- 906.1(d) provides a list of criteria the trial court "shall consider" and must "make written findings." One of the items highlighted in the list is: "(2) Reports on visitation that has occurred and whether there is a need to create, modify, or enforce an appropriate visitation plan in accordance with G.S. 7B-905.1." N.C. Gen. Stat. § 7B- 906.1(d)(2) (2021). N.C. Gen. Stat. § 7B- 905.1 addresses visitation between a parent and their children who are removed from home and taken from their custody:

> An order that removes custody of a juvenile from a parent, guardian, or custodian or that continues the *juvenile's placement outside the home shall provide for visitation* that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation. The court may specify in the order conditions under which visitation may be suspended.

N.C. Gen. Stat. § 7B-905.1(a) (2021) (emphasis supplied).

Another subsection of N.C. Gen. Stat. § 7B- 906.1 mandates criteria the trial court "shall additionally consider" and "make written findings regarding" after "any permanency planning hearing where the juvenile is not placed with a parent." N.C. Gen. Stat. § 7B- 906.1(e). The list includes the following criteria:

(1) Whether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests.

(2) Where the juvenile's placement with a parent is unlikely within six months, whether legal guardianship or custody with a relative or some other suitable person should be established and, if so, the rights and responsibilities that should remain with the parents.

(3) Where the juvenile's placement with a parent is unlikely within six months, whether adoption should be pursued and, if so, any barriers to the juvenile's adoption, including when and if termination of parental rights should be considered.

(4) Where the juvenile's placement with a parent is unlikely within six months, whether the juvenile should remain in the current placement, or be placed in another permanent living arrangement and why.

(5) Whether the county department of social services has since the initial permanency plan hearing made reasonable efforts to implement the permanent plan for the juvenile.

(6) Any other criteria the court deems necessary.

N.C. Gen. Stat. § 7B- 906.1(e)(1)-(6).

"The [trial] court may consider any evidence, including hearsay evidence . . . or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c) (2021).

This Court has remanded permanency planning orders for failure to make written findings and conclusions of law pursuant to the criteria listed in N.C. Gen.

Stat. § 7B-906.1. *See In re L.G.*, 274 N.C. App. 292, 851 S.E.2d 681 (2020). In *In re L.G.*, the trial court "ma[de] no mention of the possibility of [the child's] placement with either parent within the next six months" in the permanency planning order. *Id.* at 299, 851 S.E.2d at 687. Although the trial court "included *findings of fact* in the permanency planning order that *could support* a potential conclusion it was not possible for [the child] to be placed with [either parent] within six months, it *failed* to make that conclusion of law in the permanency planning *order*." *Id.* at 302, 851 S.E.2d at 689 (emphasis supplied). This Court remanded the matter to the trial court for "consideration of this issue and if the trial court so concludes, to include specific language regarding the possibility of [the child] being placed with a parent within six months in the permanency planning order." *Id.*

In addition to the parental protections contained in the statutes, the Supreme Court of the United States has repeatedly confirmed there is a fundamental and constitutional right of parents to the "care, custody and control" of their children. *Troxel v. Granville,* 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000) (citations omitted). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince* v. *Massachus*etts, 321 U.S. 158,166, 88 L. Ed. 645, 652 (1944).

> In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *See, e.g.,*

- 25 -

> *Stanley v. Illinois*, 405 U. S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course.")[.]

*Troxel,* 530 U.S. at 66, 147 L. Ed. 2d at 57.

DSS must overcome the constitutional and "the traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* at 69, 147 L. Ed. 2d at 59 (citing *Parham*, 442 U.S. at 602, 61 L. E. 2d at 121). Mere disagreement with or failing to follow a DSS recommendation does not render a parent unfit, nor is necessarily conduct inconsistent with the rights of a parent. *Id.* Those decisions rest with the parent.

There is often "testimony in the record below that could have supported different factual findings and possibly, even [ ] different conclusion[s,] [b]ut an important aspect of the trial court's role as finder of fact is assessing the demeanor

and credibility of witnesses, often in light of inconsistencies or contradictory evidence." *In re J.A.M.*, 372 N.C. 1, 11, 822 S.E.2d 693, 700 (2019). While the trial court is "uniquely situated to make [a] credibility determination," and "appellate courts may not reweigh the underlying evidence presented at trial," the constitutional and "the traditional presumption that a fit parent will act in the best interest of his or her child" must be overcome by the State proving unfitness or conduct inconsistent with parental rights by the prescribed burden of proof. *Id.*; *Troxel*, 530 U.S. at 69, 147 L. Ed. 2d at 59 (citing *Parham*, 442 U.S. at 602, 61 L. E. 2d at 121).

Findings describing a parent's failure to engage with a case plan or services, even if previously agreed to, does not compel, but *may* support a finding that visitation is inconsistent with a child's health and safety and may indicate probability of future neglect without a change in the parent's circumstances, status, or conditions. *In re C.M.*, 273 N.C. App. 427, 432, 848 S.E.2d 749, 753 (2020).

Here, the facts are similar to those in *In re L.G.*, because the trial court failed to include language consistent with the criteria in N.C. Gen. Stat. § 7B-906.1(d)-(e). *In re L.G.*, 274 N.C. App. at 302, 851 S.E.2d at 689. "[W]hile the trial court included *findings of fact* in the permanency planning order [which may] *support* a potential conclusion it was not possible for [Micky, Annette, and Lucy] to be placed with [Mother or Father] within six months, it *failed* to make that conclusion of law in the permanency planning *order*." *Id.* (emphasis supplied). The trial court initially ordered visitation of the children with Mother and Father. Only Mother visited her

children, while under DSS supervision. The record does not reflect any issues that arose *during* the visitation.

This matter is remanded to the trial court for further consideration. The trial court is instructed to make written and supported findings of fact as mandated and consistent with the criteria outlined in N.C. Gen. Stat. § 7B-906.1(d)-(e), including "[r]eports on visitation that has occurred and whether there is a need to create, modify, or enforce an appropriate visitation plan in accordance with G.S. 7B-905.1." *In re L.G.*, 274 N.C. App. at 302, 851 S.E.2d at 689; N.C. Gen. Stat. §§ 7B-906.1(d)-(e) and 7B-905.1.

## VII.    Conclusion

The trial court's findings of fact related to adjudication and disposition of placement of the children outside the home are supported by clear, cogent, and convincing evidence. *In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365; *In re Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676; *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

The trial court's decision to cease DSS' required reunification efforts of the children with Father and Mother is not shown to be an abuse of discretion. *In re B.R.W.*, 278 N.C. App. at 409, 863 S.E.2d at 221. The record shows no efforts by Father to relieve the conditions which led to the children's removal from the home.

The disposition order concerning visitation is remanded to the trial court for further consideration and compliance with the statute. The trial court must make

supported written findings of fact consistent with the criteria outlined in N.C. Gen. Stat. § 7B-906.1(d)-(e) and include the appropriate criteria regarding visitation in N.C. Gen. Stat. § 7B-905.1. *In re L.G.*, 274 N.C. App. at 302, 851 S.E.2d at 689; N.C. Gen. Stat. §§ 7B-906.1(d)-(e) and 7B-905.1 (2021). *It is so ordered.*

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judges ARROWOOD and RIGGS concur.